

U.S. DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA
FILED SEP 18 2019
CLERK

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

INDICTMENT FOR
CONSPIRACY TO COMMIT HEALTH CARE FRAUD,
HEALTH CARE FRAUD, AND FORFEITURE ALLEGATIONS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 19-115-BAJ-RLB |
| | : | |
| *versus* | : | 18 U.S.C. § 1349 |
| | : | 18 U.S.C. § 1347 |
| VICTOR CLARK KIRK and | : | 18 U.S.C. § 2 |
| MARILYN BROWN ANTWINE | : | 18 U.S.C. § 982(a)(7) |
| | : | 21 U.S.C. § 853(p) |

**THE GRAND JURY CHARGES:**

**AT ALL TIMES RELEVANT TO THIS INDICTMENT:**

### Background

### Medicaid Generally

1. The Louisiana Medicaid Program ("Medicaid") was a federal and state funded health insurance program designed to provide medical assistance to persons whose income and resources were insufficient to meet the costs of necessary care and services, and was a "health care benefit program" within the meaning of Title 18, United States Code, Section 24(b).

2. Medicaid was administered by the United States Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services ("CMS").

3. Individuals who qualified for Medicaid benefits were commonly referred to as "recipients." Each recipient was given a Medicaid identification number.

4.      CMS contracted with the Louisiana Department of Health and Hospitals ("DHH") to manage the Medicaid program in Louisiana, including the enrollment of medical service providers ("providers") and the processing of claims for services rendered to Medicaid recipients.

5.      As part of the Medicaid enrollment process, providers submitted enrollment applications to Medicaid. As part of the application, providers were required to certify that they would adhere to the Medicaid regulations and that all services provided to recipients were medically necessary and appropriate for each individual recipient based on needs presented on the date of service. Provider enrollment applications further stated that any false claims, statements, or documents, or concealment of a material fact, could be prosecuted under applicable federal and state laws.

6.      Upon enrollment in the Medicaid program, providers were furnished with a letter containing specific instructions on how to access the "Provider Manual" through DHH's website, which was maintained under the authority of DHH and set forth the terms and conditions under which payment would be made for services rendered.

7.      Medicaid required providers to maintain complete and accurate records reflecting the medical assessments and diagnoses of Medicaid recipients as well as records documenting treatment and other services provided to recipients, such as progress notes. The supporting documentation was not submitted to Medicaid. Rather, providers were required to retain such documentation at their premises and produce these documents upon request by Medicaid or their contracted carriers.

8.      Upon providing services to recipients, Medicaid-enrolled providers submitted claims to Medicaid, typically electronically, seeking reimbursement for the cost of services

2

rendered. Medicaid's practice of reimbursing providers per service rendered, through a fiscal intermediary, was commonly referred to as a "fee-for-service" payment structure.

9. When seeking reimbursement from Medicaid, providers submitted the cost of the service provided together with the appropriate "procedure code," as defined by the American Medical Association and set forth and maintained in the Current Procedural Terminology ("CPT") Manual, which was a uniform and universally recognized system of medical services coding that assigned numeric designations or procedure codes to individual medical procedures. Additionally, the CPT Manual defined the procedural and medical requirements that must be met in order for a provider to bill for a particular medical service.

10. Moreover, in seeking reimbursement from Medicaid, claims submitted by providers included diagnostic codes, which classified, among other things, recipients' conditions, disorders, and diseases, utilizing codes set forth in International Classification of Diseases, 9th Revision ("ICD-9"). Together, the diagnosis codes and procedure codes identified for Medicaid the reasons for treatment and the treatments provided. Generally speaking, if services rendered by providers were medically necessary to treat recipients' diagnosed conditions, Medicaid appropriately reimbursed those claims. Conversely, if providers rendered services that were not medically necessary to treat diagnosed conditions, such claims were not appropriately reimbursed by Medicaid.

11. Although providers submitted the cost of the service provided, Medicaid reimbursed designated, specific amounts according to the CPT code utilized. For instance, when a provider submitted a claim utilizing CPT code 90853, indicating that Group Psychotherapy had been provided, Medicaid would reimburse the provider between

approximately $15.44 and $20.55, depending on whether the service was performed by a psychologist or other health care professional.

12. In approximately 2012, Medicaid contracted with several fiscal intermediaries in Louisiana, known as Managed Care Organizations ("MCOs"), to adjudicate claims on its behalf. One such MCO was Magellan Health Services of Louisiana, Inc. ("Magellan").

### Federally Qualified Health Centers and Encounters

13. A Federally Qualified Health Center ("FQHC") was a center that provided health care services to residents of medically underserved urban and rural communities, including Medicaid recipients. As part of their contract with Medicaid, FQHCs agreed to provide primary care services, typically that of a physician's medical practice, to recipients.

14. FQHCs could also provide services related to the diagnosis and treatment of mental illnesses, which Medicaid interpreted as the diagnosis and treatment of Axis I disorders, including mood, eating, psychotic, dissociative, and substance use disorders, as defined by the Diagnostic and Statistical Manual of Mental Disorders ("Axis I Disorders").

15. In addition to providing center-based services, FQHCs could contract with schools to provide onsite medical services to students, including students who were eligible to receive Medicaid benefits. These school-based services could include behavioral health services for the purpose of diagnosing and treating mental illness affecting the students.

16. Medicaid reimbursed claims submitted by FQHCs, unlike other providers, at flat rates per "encounter," regardless of the number or types of services rendered to a specific recipient. Whether a FQHC provided one or several services to a recipient on a given day, the FQHC billed Medicaid for the encounter, using an encounter code, and would be reimbursed a predetermined sum, regardless of the actual cost of the services that would otherwise have

been reimbursed. Accordingly, in addition to submitting the appropriate CPT codes and ICD-9 codes (as described in paragraphs 9 and 10 above), FQHCs also utilized encounter code T1015, indicating that an all-inclusive visit had occurred. For instance, while the Medicaid reimbursement rate for a single Group Psychotherapy session billed under CPT codes 90853 (Group Psychotherapy) or 90857 (Interactive Group Psychotherapy) might be approximately $15.44, by also using encounter code T1015, a FQHC could submit a claim to Medicaid and be reimbursed approximately $151.83 for the "encounter" with the recipient.

17. Like other reimbursable procedures, Medicaid required FQHC encounters billed pursuant to encounter code T1015 to be medically necessary.

### Outpatient Therapy by Licensed Practitioners

18. Pursuant to Medicaid rules and regulations, licensed mental health practitioners were individuals licensed in the State of Louisiana to diagnose and treat mental illness or substance abuse, acting within the scope of all applicable State laws and their professional licenses.

19. Licensed clinical social workers, registered social workers, and licensed professional counselors were licensed mental health practitioners.

20. Medicaid required behavioral health services provided in schools by mental health practitioners to be medically necessary and provided in accordance with the student's individualized education program. Covered services included treatment and other measures, such as individual or group psychotherapy, to correct and ameliorate an identified mental health or substance abuse diagnosis, specifically, an Axis I Disorder.

21. Medicaid specifically excluded from Medicaid coverage services performed for educational purposes.

5

**The Defendants, Relevant Entity, and Relevant Individuals**

22. St. Gabriel Health Clinic, Inc. ("St. Gabriel") was a Louisiana non-profit corporation, incorporated in 1993 and headquartered at 5760 Monticello Drive, St. Gabriel, Louisiana 70776. St. Gabriel was a FQHC that provided a variety of services to individuals with both private and public health insurance, including Medicaid. In or about 1997, St. Gabriel contracted with the Iberville Parish School Board to provide medical services at East Iberville High School and Elementary School, and in or about 2011, St. Gabriel contracted to provide medical services at East Iberville Math, Science, and Arts Academy (collectively, the "Iberville Schools"). St. Gabriel employed several mental health practitioners and others to provide the medical services, including behavioral health services.

23. Defendant **VICTOR CLARK KIRK**, a resident of Baton Rouge, Louisiana, was the Chief Executive Officer of St. Gabriel, primarily responsible for overseeing the services that St. Gabriel employees provided at the Iberville Schools. **KIRK** ran the day-to-day operations of St. Gabriel and contracted with Medicaid on behalf of St. Gabriel. In contracting with Medicaid on behalf of St. Gabriel, **KIRK** agreed to abide by all laws and regulations of the Medicaid program.

24. Defendant **MARILYN BROWN ANTWINE**, a resident of Baton Rouge Louisiana, was the Chief Operating Officer of St. Gabriel, primarily responsible for overseeing claims submitted to Medicaid and others for services rendered by St. Gabriel employees at the Iberville Schools. In addition, during a time when **KIRK** took a leave of absence from St. Gabriel, **ANTWINE** assumed **KIRK's** responsibilities as Chief Executive Officer of St. Gabriel.

25. Michael Dan Gaines, a resident of Baker, Louisiana, was a supervisory-level, licensed social worker employed by St. Gabriel who provided behavioral health services to students at the Iberville Schools. Gaines was responsible for assessing and diagnosing students who needed behavioral health therapy, providing behavioral health therapy (such as group psychotherapy), and preparing and signing off on progress notes for the services provided by St. Gabriel employed social workers performed at the Iberville Schools.

## The Fraudulent Scheme

### Purpose of the Scheme

26. It was a purpose of the conspiracy for the defendants to unlawfully enrich themselves by, among other things: (a) submitting and causing the submission of false and fraudulent claims to Medicaid and other health care benefit programs for services that were not provided in the manner claimed for reimbursement or were not provided at all; (b) concealing the submission of false and fraudulent claims to Medicaid and other health care benefit programs; and (c) diverting proceeds of the fraud for the personal use and benefit of the defendants and their co-conspirators.

### Manner and Means of the Scheme

27. The manner and means by which the defendants sought to accomplish the object of the scheme included, among others, the following:

    a. At **KIRK**'s direction, at the beginning of each school year, St. Gabriel employees, including Gaines, collected parental consent forms from the students enrolled at the Iberville Schools. These consent forms allowed St. Gabriel employees to provide various medical services, including primary and preventive health care, dental services, acute care

7

services, and behavioral health services, to students at the Iberville Schools over the course of a school year without having to notify parents each time such services were performed.

      b.    Pursuant to these consent forms and unbeknownst to many parents, pursuant to **KIRK's** direction, St. Gabriel practitioners, including Gaines, performed assessments of students, including Medicaid recipients, to determine what, if any, behavioral health services those students may have needed.

      c.    At **KIRK's** direction, irrespective of the outcomes of the assessments, St. Gabriel practitioners, including Gaines, provided educational services and character development programs ("Educational Services") to entire classrooms of students, including recipients, at the Iberville Schools. These Educational Services, including a program called "Character Counts!", were provided during regular class periods (often with teachers present), were educational in nature, and were not tailored to any particular student's individualized educational program.

      d.    At **KIRK's** direction, for students who had signed consent forms and who were present for these Educational Services, Gaines and other St. Gabriel practitioners created progress notes detailing the date and nature of the services purportedly provided, typically indicating that group psychotherapy sessions had been performed.

      e.    To maximize reimbursement from Medicaid and other health care benefit programs, **KIRK** instructed Gaines and other St. Gabriel practitioners to create false and fraudulent progress notes indicating that the students who were present for these Educational Services required group psychotherapy and that the Educational Services rendered constituted group psychotherapy. This was done despite the fact that Medicaid, and other health care benefit programs, specifically excluded educational services from coverage.

8

f. Based on these false and fraudulent progress notes, and for the purpose of defrauding Medicaid and other health care benefit programs, **KIRK** and **ANTWINE** submitted, and caused others to submit, fraudulent claims to Medicaid and other health care benefit programs representing that group psychotherapy was rendered to recipients and others. St. Gabriel billed these Educational Services to Medicaid and other health care benefit programs using CPT codes 90853 and 90857, which attested that the services rendered were psycho-therapeutic in nature, when in actuality, the programs were educational. When submitting these claims to Medicaid, St. Gabriel further utilized encounter code T1015, which, because of St. Gabriel's status as a FQHC, allowed it to bill Medicaid for amounts far higher than a non-FQHC would have been able to bill for the same purported services.

g. In approximately 2012, Medicaid, through Magellan, discontinued reimbursing St. Gabriel's claims for group psychotherapy that were not accompanied by Axis I diagnosis codes.

h. In response, to facilitate St. Gabriel's ability to continue fraudulently billing Medicaid and other health care benefit programs for the Educational Services and to maximize St. Gabriel's reimbursements, St. Gabriel practitioners, including Gaines, at the direction of **KIRK** and **ANTWINE**, falsely diagnosed students who received the Educational Services with Axis I Disorders. At **KIRK's** and **ANTWINE's** direction, St. Gabriel practitioners diagnosed students, including recipients, with serious mental disorders such as adjustment reactive disorder, reactive attachment disorder, acute stress reactions, and other conditions, without regard to whether such diagnoses were accurate or had any basis in fact.

i. At the same time, at **KIRK's** direction, St. Gabriel practitioners continued to provide the Educational Services to entire classrooms of students, often with

9

teachers present, and prepare progress notes indicating that group psychotherapy had been provided, when in reality only Educational Services were provided.

j. At **KIRK's** and **ANTWINE's** direction, based on the false diagnoses and the progress notes prepared and certified by St. Gabriel practitioners, including Gaines, St. Gabriel, through **ANTWINE** and others, submitted fraudulent claims to Medicaid and other health care benefit programs indicating that (a) St. Gabriel was providing group psychotherapy (when in fact St. Gabriel was providing the Educational Services), and (b) the students receiving the services, including recipients, required treatment for Axis I Disorders (when in fact they did not).

k. Meanwhile, on more than 100 occasions, to further maximize St. Gabriel's reimbursements from Medicaid, St. Gabriel practitioners, including Gaines, signed progress notes certifying that purported psychotherapy services had been provided, and St. Gabriel subsequently submitted claims to Medicaid for such services, on dates when the recipients named in the claims had been verifiably absent from school and could not have received any such treatment.

l. **ANTWINE** directed that her billing staff change diagnosis codes so that previously denied claims would be reimbursed by Medicaid, and on at least one occasion, she fired an employee for refusing to do so.

m. To conceal the fraudulent claims, neither **KIRK**, **ANTWINE**, nor Gaines informed the parents or guardians of students at the Iberville Schools, including recipients, that their children were diagnosed with Axis I Disorders, nor that their children were receiving purported group psychotherapy services, despite the fact that the fraudulent diagnoses could remain in the students' medical records for years.

10

n. From approximately August 2011 through June 2015, at the direction of **KIRK** and **ANTWINE**, St. Gabriel billed Medicaid for purported group psychotherapy services rendered to students at the Iberville Schools, and was reimbursed approximately $1,841,527.31.

## COUNT 1
## Conspiracy to Commit Health Care Fraud
## (18 U.S.C. § 1349)

### The Conspiracy and Its Object

28. Paragraphs 1 through 25 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

29. Beginning in or around 2011, and continuing through in or around June 2015, in the Middle District of Louisiana, and elsewhere, the defendants, **VICTOR CLARK KIRK** and **MARILYN BROWN ANTWINE**, conspired and agreed with each other, Gaines, and others known and unknown to the Grand Jury, to commit certain offenses against the United States, that is, to knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicaid and other health care benefit programs, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money owned by, and under the custody and control of, Medicaid and other health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

## Purpose of the Conspiracy

30. It was a purpose of the conspiracy for **KIRK** and **ANTWINE** and their co-conspirators to unlawfully enrich themselves, as described in Paragraph 26 of this Indictment, and re-alleged and incorporated by reference at though fully set forth herein.

## Manner and Means of the Conspiracy

31. In furtherance of the conspiracy and to accomplish its objects and purpose, the methods, manner, and means that were used are described in Paragraph 27 of this Indictment, are re-alleged and incorporated by reference as thought fully set forth herein.

All in violation of Title 18, United States Code, Section 1349.

## Counts 2-6
## Health Care Fraud
## (18 U.S.C. §§ 1347 and 2)

### The Scheme and Execution of the Scheme

32. Paragraphs 1 through 27 of this Indictment are re-alleged and incorporated by reference as through fully set forth herein.

33. Beginning in or around 2011, and continuing through in or around June 2015, in the Middle District of Louisiana, and elsewhere, the defendants, **VICTOR CLARK KIRK** and **MARILYN BROWN ANTWINE**, aided and abetted by others known and unknown to the Grand Jury, in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme or artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicaid and other health care benefit programs, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money owned by, and under the custody and control of, Medicaid and other health care benefit

12

programs.

34. The scheme to defraud is more fully described in Paragraphs 26 through 27 of this Indictment and is re-alleged and incorporated by reference as if fully set forth herein.

35. On or about the dates specified below, in the Middle District of Louisiana, and elsewhere, the defendants, **VICTOR CLARK KIRK** and **MARILYN BROWN ANTWINE**, aided and abetted by others, and aiding and abetting others known and unknown to the Grand Jury, submitted or caused to be submitted the following false and fraudulent claims to Medicaid for purported group psychotherapy services that had been rendered to recipients with diagnoses for Axis I Disorders, when in reality, the Axis I Disorders were falsely assigned in order to bill for group psychotherapy that was neither provided nor medically necessary, in an attempt to execute, and in execution of the scheme to defraud, as described in Paragraphs 26 and 27 of this Indictment, with each execution set forth below forming a separate count:

| Count | Recipient | Diagnosis Code Billed | Procedure Code Billed | Claim Number | Service Date | Amount Paid | Date Paid |
|---|---|---|---|---|---|---|---|
| 2 | C.A. | Impulse Control Disorder – 312.30 | T1015 90853 | 4268140900200 4268140900300 | 9/11/14 | $160.08 $0.00 | 9/20/14 |
| 3 | J.A. | Adjustment Disorder with Mixed Disturbance of Emotions and Conduct – 309.4 Acute Stress Reaction – 308.3 | T1015 90853 | 4268140902000 4268140902100 | 9/11/14 | $160.08 $0.00 | 9/20/14 |
| 4 | R.L. | Adjustment Disorder with | T1015 90853 | 4288122558100 4288122558200 | 9/16/14 | $160.08 $0.00 | 9/27/14 |

13

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | Anxiety – 309.24 | | | | | |
| 5 | A.T. | Impulse Control Disorder – 312.30 | T1015 90853 | 5015139330400 5015139330500 | 1/6/15 | $160.08 $0.00 | 1/12/15 |
| 6 | J.D. | Adjustment Disorder with Anxiety – 309.24 | T1015 90853 | 5099132900800 5099132900801 | 2/10/15 | $160.08 $0.00 | 4/6/15 |

Each of the above is a violation of Title 18, United States Code, Sections 1347 and 2.

### FORFEITURE ALLEGATIONS

1. Upon conviction of any of the offenses set forth above, the defendants, **VICTOR CLARK KIRK** and **MARILYN BROWN ANTWINE**, shall forfeit to the United States pursuant to 18 U.S.C. § 982(a)(7), all property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds of the violations, including but not limited to a sum of money equal to the amount of the gross proceeds of the offenses.

2. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) as incorporated by 18 U.S.C. § 982(b), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above.

| | |
|---|---|
| UNITED STATES OF AMERICA, by | A TRUE BILL |
| *[signature]* | **REDACTED PER PRIVACY ACT** |
| BRANDON J. FREMIN<br>UNITED STATES ATTORNEY | GRAND JURY FOREPERSON |
| *[signature]* | |
| JESSICA M.P. THORNHILL<br>ASSISTANT UNITED STATES ATTORNEY | 9-18-2019<br>DATE |
| *[signature]* | |
| JUSTIN M. WOODARD<br>TRIAL ATTORNEY<br>CRIMINAL DIVISION, FRAUD SECTION<br>UNITED STATES DEPARTMENT OF JUSTICE | |

## Criminal Cover Sheet — U.S. District Court

**Place of Offense:**    Matter to be sealed:  ☐ No  ☒ Yes

City  **Baton Rouge**      **Related Case Information:**

County/Parish  **East Baton Rouge**      Superseding Indictment _____ Docket Number _____
Same Defendant _____ New Defendant _____

*Investigating Agency  **HHS-OIG**      Magistrate Case Number _____
*Agent  **Ritchard Houdashelt**      Search Warrant Case No. _____
R 20/ R 40 from District of _____
Any Other Related Cases: _____

**Defendant Information:**

Defendant Name:   **Marilyn Brown Antwine**

**U.S. Attorney Information:**

AUSA   Jessica M.P. Thornhill   Bar # LBN 34118

**Interpreter:**  ☒ No  ☐ Yes   **List language and/or dialect:** _____

**Location Status:**

Arrest Date _____
_____ Already in Federal Custody as of
_____ Already in State Custody
_____ On Pretrial Release

**U.S.C. Citations:**

Total # of Counts:  __6__

| Index Key/Code | Description of Offense Charged | Count(s) | Petty/Misdemeanor/Felony |
|---|---|---|---|
| 18 U.S.C. § 1349 | Conspiracy to Commit Health Care Fraud | 1 | F |
| 18 U.S.C. §§ 1347 | Health Care Fraud | 2-6 | F |
| 18 U.S.C. § 2 | Aiding and Abetting | 2-6 | F |

Date: 9/18/19     Signature of AUSA: _[signature]_

District Court Case Number (To be filled in by deputy clerk): _____

## Criminal Cover Sheet      U.S. District Court

**Place of Offense:**                           Matter to be sealed:   ☐ No  ☒ Yes

City          **Baton Rouge**              Related Case Information:

County/Parish  **East Baton Rouge**    Superseding Indictment _____ Docket Number _____
                                        Same Defendant _____ New Defendant _____
*Investigating Agency **HHS-OIG**       Magistrate Case Number _____
*Agent **Ritchard Houdashelt**          Search Warrant Case No. _____
                                        R 20/ R 40 from District of _____
                                        Any Other Related Cases: _____

**Defendant Information:**

Defendant Name:   **Victor Clark Kirk**

**U.S. Attorney Information:**

AUSA    Jessica M.P. Thornhill        Bar # LBN 34118

**Interpreter:**  ☒ No  ☐ Yes     **List language and/or dialect:** _____

**Location Status:**

Arrest Date   _____
_____  Already in Federal Custody as of
_____  Already in State Custody
_____  On Pretrial Release

**U.S.C. Citations:**

Total # of Counts:   __6__

| Index Key/Code | Description of Offense Charged | Count(s) | Petty/Misdemeanor/Felony |
|---|---|---|---|
| 18 U.S.C. § 1349 | Conspiracy to Commit Health Care Fraud | 1 | F |
| 18 U.S.C. §§ 1347 | Health Care Fraud | 2-6 | F |
| 18 U.S.C. § 2 | Aiding and Abetting | 2-6 | F |

Date: 9/18/19           Signature of AUSA: _(signed)_

District Court Case Number (To be filled in by deputy clerk): _____