UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                    CRIMINAL NO. 19-115-1

VERSUS                                       JUDGE JACKSON

VICTOR CLARK KIRK

REMAND BRIEF FOR VICTOR CLARK KIRK

NOW INTO COURT, through undersigned counsel, comes the defendant Victor Clark Kirk, who hereby respectfully submits this brief addressing the forfeiture issue remanded to this Court from the U.S. Court of Appeals for the Fifth Circuit.

## I.     BACKGROUND[1]

Applying the facts consistent with the jury verdict, from January 2011 to June 2015, Kirk—as the Chief Executive Officer of St. Gabriel Health Clinic, a non-profit corporation that operated medical clinics inside Louisiana schools—conspired to defraud Medicaid. Under his direction, St. Gabriel employees administered educational and character development programs, including one called "Character Counts!," to entire classrooms of students, including Medicaid recipients, and then billed these services as group psychotherapy sessions. Even though Medicaid does not cover educational services, St. Gabriel employees, at Kirk's direction, created false and fraudulent progress notes indicating that the students present for the program required group psychotherapy and that the services provided constituted as such.

After Medicaid ceased reimbursing St. Gabriel's claims for group

---

[1] These facts are taken from the Fifth Circuit opinion in this case.

1

psychotherapy sessions in the absence of an Axis I diagnosis, St. Gabriel employees, again at the direction of Kirk, falsely diagnosed students who received the education services with Axis I diagnoses. In total, Medicaid paid approximately $1.8 million in claims to St. Gabriel for group psychotherapy sessions even though St. Gabriel merely provided educational services.

A jury found Kirk guilty of one count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, and five counts of health care fraud, in violation of 18 U.S.C. §§ 1347 and 2. Prior to sentencing, the government filed a motion to amend the preliminary order of a general forfeiture money judgment, seeking a forfeiture money judgment of $234,789.87. The government argued that since 45 percent of St. Gabriel's revenue, or $1.8 million out of $4 million, was derived from the fraudulent billing scheme, the Court should order Kirk to forfeit 45 percent of his salary and compensation that he earned during the alleged fraud. This percentage was based solely on the money illegally sought compared to the total amount paid by Medicaid (i.e., some of which was properly sought). In addition, the government urged the Court to order Kirk to forfeit all of his bonus and incentive payments earned during the alleged fraud.

Kirk opposed this motion, arguing, among other things, that the Court should only order Kirk to forfeit 18 percent of his total salary and benefits because St. Gabriel's total revenue (both Medicaid and non-Medicaid) during the time of the alleged fraud was more than $10 million. As such, Kirk requested the Court to order forfeiture totaling no more than $75,957.

At sentencing, Kirk introduced financial statements demonstrating that St.

Gabriel received over $10 million in total revenue during the conspiracy and reargued that the Court should order Kirk to forfeit, at most, 20 percent of the salary he received during the fraud. The Court credited the government's proposed forfeiture amount over Kirk's. Kirk appealed and the Fifth Circuit remanded "the forfeiture money judgment for more detailed findings by the district court regarding both Kirk's salary and his bonuses during the alleged fraud based upon the evidence originally presented." Doc. # 239, p. 8. This Court issued an order requesting each party submit a "brief relying only on evidence that is already in the record." Doc. # 240.

## II.    FACTS RELEVANT TO FORFEITURE

Kirk's indictment included a forfeiture allegation providing that Kirk "shall forfeit to the United States pursuant to 18 U.S.C. § 982(a)(7), all property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds of the violations, including but not limited to a sum of money equal to the amount of the gross proceeds of the offenses." Doc. # 1, pp. 14-15. After Kirk was convicted, the government filed a motion for entry of preliminary order of forfeiture. Doc. # 161. This motion sought a general forfeiture money judgment and did not specify an amount sought. *Id.* The court granted the preliminary motion. Doc. # 167.

Just prior to the sentencing hearing, the government filed a motion to amend preliminary order of forfeiture asking the Court to order a specific forfeiture money judgment in the amount of $234,789.87 against Kirk. Doc. # 204. In its motion, the government first argued that Kirk received $81,500 in bonus and incentive payments and that *all* these payments were linked to fraud and were, thus, forfeitable. The government based this argument on the fact that Kirk received these bonus and

incentive payments by bringing in external funding to St. Gabriel and that *Character Counts* is what led to the external funding. *Id.*

Second, the government argued that $153,289.87 of Kirk's remaining salary and compensation during the offense conduct period should be forfeited because that represented the same proportion of Kirk's salary as the proportion of St. Gabriel's revenue that was tied to the fraudulent *Character Counts* billing. According to the government's argument, St. Gabriel received about 4.0 million in payments from Medicaid during the offense conduct and 1.8 million of that was for the fraudulent *Character Counts* billing. *Id.* The government based the 4.0 million dollar figure on the following statement during trial by special agent Joseph Springer:

> Yes. So in the time period that we looked at where they were paid 1.8 million for group psychotherapy claims overall, including all services, individual therapy, nursing services, in total Medicaid paid them approximately $4 million. So the group psychotherapy was a little less than half of all money paid by Medicaid.

Doc. # 226, p. 189. The government asserted that 1.8 million out of 4.0 million of total claims paid equals 45 percent of St. Gabriel's revenue from Medicaid. Doc. # 204. The same percentage (45) of Kirk's salary and other compensation resulted in $153,289.87. Combining the $81,500 in bonus and incentive payments and the $153,289.87 in salary and other compensation resulted in the government's total requested forfeiture amount of $234,789.87. *Id.*

Kirk filed a written opposition in which he asserted that the 1.8 million received by St. Gabriel as a part of the fraudulent *Character Counts* billing represented only 18 percent of the revenue received by St. Gabriel during the offense conduct. Doc. # 207. Kirk argued that the government's total St. Gabriel revenue

figure was incorrect because it *only* included money received by St. Gabriel from Medicaid, whereas St. Gabriel had many other sources of legitimate revenue that Kirk oversaw as CEO.  Specifically, St. Gabriel offered the full array of primary health care services, including preventive care, oral health, behavioral health, diagnostic laboratory work, urgent care, gynecological care, family planning, immunizations, case management, health education, HIV testing and counseling, and translation services. *Id.* According to public *Audited Financial Statements* for St. Gabriel during the offense conduct, St. Gabriel's total revenue was over 10 million dollars.[2]

At the sentencing hearing, Kirk introduced the audit reports without objection by the government. Doc. # 216, p. 42 (transcript); Doc. # 234-4 (*Defense Sentencing Exhibit 3 – SGHC Audited Financial Statements*). Kirk then argued that the audit

---

[2] The Louisiana Legislative Auditor provides reports on various entities that receive public funds. As a recipient of public funds, St Gabriel was required to provide a third-party independent audit report each year. The St. Gabriel audit reports are publicly available on the Louisiana Legislative Auditor website:

- *ST. GABRIEL HEALTH CLINIC, INC., AUDITED FINANCIAL STATEMENTS, FEBRUARY 29, 2012 and 2011* available at https://app.lla.state.la.us/publicreports.nsf/0/0a1d3793864f594d86257a990072551f/$file/0002d12e.pdf?openelement&.7773098 (last accessed May 29, 2023).
- *ST. GABRIEL HEALTH CLINIC, INC., AUDITED FINANCIAL STATEMENTS, FEBRUARY 28, 2013 and 2012* available at https://app.lla.state.la.us/publicreports.nsf/0/e686c49ea1d65eeb86257c0d00485fb7/$file/00035d38.pdf?openelement&.7773098 (last accessed May 29, 2023).
- *ST. GABRIEL HEALTH CLINIC, INC., AUDITED FINANCIAL STATEMENTS,* FEBRUARY 28, 2014 and 2013 available at https://app.lla.state.la.us/publicreports.nsf/0/1ee637084ca71f6286257da9006b7f42/$file/00004072.pdf?openelement&.7773098 (last accessed May 29, 2023).
- *ST. GABRIEL HEALTH CLINIC, INC., AUDITED FINANCIAL STATEMENTS, FEBRUARY 29, 2016 (With Summarized Financial Information for 2015) available at* https://app.lla.state.la.us/publicreports.nsf/0/92d95556ce5dcb07862581e6005dfdfd/$file/00016a3d.pdf?openelement&.7773098 (last accessed May 29, 2023).
- *ST. GABRIEL HEALTH CLINIC, INC., AUDITED FINANCIAL STATEMENTS, FEBRUARY 28, 2017 (With Summarized Financial Information for 2016) available at* https://app.lla.state.la.us/publicreports.nsf/0/7ca9100e770db377862581f5005fd048/$file/00016cea.pdf?openelement&.7773098 (last accessed May 29, 2023).

reports, which are publicly available accounting documents for St. Gabriel and were prepared by an independent third-party auditor clearly showed that St. Gabriel received at least 10 million dollars in revenue during the offense conduct. Doc. # 216, pp. 41-46 (transcript); Doc. # 234-5 (*Defense Sentencing Exhibit 4 – Calculation Sheet from Legislative Auditor*). Kirk argued that the government's proposal that a proportion of Kirk's salary equivalent to the proportion of the fraudulent revenue received by St. Gabriel must account for all the revenue received by St. Gabriel. Doc. # 216, pp. 41-46.

At the hearing, the government continued to rely on the testimony of agent Springer that 45 percent of Kirk's salary and benefits was attributed to fraud. Doc. # 216, pp. 47. The government did not address the 10 million dollars in St. Gabriel revenue contained in the audited financial statements nor did the government explain why agent Springer only included 4 million dollars in St. Gabriel revenue in his 45 percent calculation.

## III.   APPLICABLE LAW

The forfeiture requested in this case is governed by 18 U.S.C. § 982. With respect to health care fraud, Section 982 provides that:

> The court, in imposing sentence on a person convicted of a Federal health care offense, shall order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

18 U.S.C. § 982(a)(7).

For forfeiture of property, the court "must determine whether the government has established the requisite nexus between th[at] property and the [charged] offense under the applicable statute." *United States v. Ayika*, 837 F.3d 460, 469 (5th Cir.

2016). The government "must establish the requisite nexus between the property and the offense by a preponderance of the evidence." *United States v. Juluke*, 426 F.3d 323, 326 (5th Cir. 2005). The court must make a "reasonable estimate" of the forfeiture amount. *United States v. Mazkouri*, 945 F.3d 293, 307 (5th Cir. 2019).

## IV. THIS COURT SHOULD ORDER FORFEITURE IN THE AMOUNT OF $82,686.19, WHICH IS 19.587 PERCENT OF KIRK'S TOTAL COMPENSATION

The very crux of a forfeiture money judgment is that "[t]he amount of a personal money judgment is measured by the proceeds of the defendant's illegal activity." *United States v. Nagin*, 810 F.3d 348, 353 (5th Cir. 2016). Put another way by the Fifth Circuit, "the forfeiture statute thus does not allow [a defendant] to be responsible for any amount beyond the proceeds of the [] fraud that he obtained." *United States v. Sanjar*, 876 F.3d 725, 749 (5th Cir. 2017). Thus, to support a forfeiture money judgment against Kirk, the government must trace the *proceeds* from Medicaid's payments to St. Gabriel for the *Character Counts* billing; and then trace the proceeds from St. Gabriel to Kirk himself.

In *Ayika*, the Fifth Circuit confronted criminal forfeiture in a similar health care fraud context. 837 F.3d at 468. The defendant ran a pharmacy and was convicted of health care fraud in connection with false claims for benefits. *Id.* at 463-64. The district court ordered forfeiture of several assets, including funds in the pharmacy's main bank account. *Id.* at 468-69. The defendant contended that some of the funds deposited into that account over its life came from legitimate sources such as lawful billings, thus precluding forfeiture. *Id.* at 470.

Applying § 982(a)(7)—the same provisions at issue here—the *Ayika* Court held

that the government hadn't shown that the funds in the account were directly or indirectly derived from the health care fraud. *Id.* at 474. The Court noted that it's difficult "to determine the exact source of any specific dollar or dollars" where "legitimate money and illegitimate money are placed in the same account, and various withdrawals and other deposits occur over time." *Id.* at 472. In light of that difficulty, the Court interpreted the "requirements of tracing under § 982(a)(7) ... to be demanding for establishing forfeiture." *Id.* at 474. And because the government conceded that only about thirty-four percent of the funds deposited into the account were proceeds of the health care fraud, *id.* at 471 n.17, the seized funds were not traceable to that offense, *id.* at 474.

*Ayika* did not involve a specific forfeiture money judgment, but its interpretation of § 982(a)(7) is instructive. In this case, the government conceded that the money Medicaid paid for *Character Counts* did not go to Kirk; it went to St. Gabriel. Doc. # 204; Doc. # 216, p. 47. The government also conceded that St. Gabriel received legitimate revenue outside of the *Character Counts* billing. *Id.* Therefore the only question is what percentage of Kirk's compensation can the government trace to *Character Counts* billing?

### 1.    Only 19.587 percent of Kirk's salary and compensation during the offense conduct is traceable to proceeds from the crime

Only 19.5 percent of Kirk's salary and compensation are traceable to proceeds from *Character Counts* billing. It is undisputed that Kirk received $340,644.17 in salary and compensation. It was also undisputed that St. Gabriel received 1.8 million from Medicaid for the *Character Counts* billing. The forfeiture question, therefore, was what amount of that salary could be traced to the proceeds from the *Character*

*Counts* billing.

The government original proposal was incorrect in its determination of what percentage of St. Gabriel's revenue during the offense conduct was the result of *Character Counts* billing. Put simply, the government used the wrong denominator in its formula:

| Government calculation: | Defense calculation: |
|---|---|
| $\dfrac{\$1{,}800{,}000 \; fraud \; proceeds}{\$4{,}000{,}000 \; total \; revenue} = 45$ percent | $\dfrac{\$1{,}800{,}000 \; fraud \; proceeds}{\$9{,}189{,}678 \; total \; revenue} = 19.587$ percent |

To support the 4.0 million total revenue figure the government relied on a statement made by agent Joseph Springer during his trial testimony. That statement was:

> So in the time period that we looked at where they were paid 1.8 million for group psychotherapy claims overall, including all services, individual therapy, nursing services, in total Medicaid paid them approximately $4 million. So the group psychotherapy was a little less than half of all money paid by Medicaid.

Doc. # 226, p. 189. According to this statement, the 4.0 million figure discussed by Springer *only* includes revenue received by St. Gabriel from Medicaid. It does not include the numerous sources of other revenue received by St. Gabriel.

As explained in the original sentencing filings, as CEO Kirk was not only in charge of St. Gabriel's Medicaid approved services, but he was also in charge of the entire health care organization which provided the full array of primary health care services, including preventive care, oral health, behavioral health, diagnostic laboratory work, urgent care, gynecological care, family planning, immunizations, case management, health education, HIV testing and counseling, and translation

services. Doc. # 207, pp.520-22. While Springer might be correct that St. Gabriel only received 4.0 million from Medicaid during the offense conduct, St. Gabriel received over nine million dollars in revenue from all sources during the same time period. Docs. ## 234-4, 234-5. Kirk's salary was for his role as CEO over all of St. Gabriel's various services.

The Government bears the burden to establish amounts for forfeiture, at which point the burden shifts to the defendant to prove the inaccuracy of the loss calculation. *United States v. Dickerson*, 909 F.3d 118, 130 (5th Cir. 2018). At the original sentencing, Kirk did not just object to the government's reliance on Springer's testimony, Kirk submitted uncontroverted evidence directly refuting Springer and supporting St. Gabriel's true revenue numbers in the form of independent audit reports, which are publicly available accounting documents for St. Gabriel that were prepared by a third-party auditor and filed with the state. Doc. # 216, pp. 41-46; Doc. # 234-4; *Compare with Dickerson*, 909 F.3d at 130 (defendant did not introduce evidence to contravene financial analysis in the PSR). According to those reports, St. Gabriel brought in over $9,189,678[3] in revenue during the offense conduct. Docs. ## 234-4, 234-5.

---

[3] Here is how this number is reached. According to the Legislative Auditor reports, St. Gabriel brought in the following support and revenue:

    2011 - $1,666,941
    2012 - $2,096,967
    2013 - $2,163,123
    2014 - $2,248,727
    2015 - $2,027,840***

*See* Doc. # 234-5. But because the offense conduct ended in the middle of 2015, only half of the 2015 revenue should be counted which reduced the 2015 revenue to $1,013,920. This results in a total revenue of $9,189,678 during the offense conduct.

Because the evidence in the record only supports that 19.587 percent of the St. Gabriel revenue came from proceeds of the fraud, only 19.587 percent of Kirk's salary can be considered proceeds derived from the criminal activity.

### 2.    Only 19.587 percent of Kirk's bonus and incentive payments were traceable to proceeds from the fraud

The government originally argued that all of Kirk's bonus and incentive payments should be forfeited because Kirk received these bonus and incentive payments by bringing in external funding to St. Gabriel and that *Character Counts* is what led to the external funding. Doc. # 204-1, pp. 3-4. But the government failed to introduce evidence to support this position. *See Dickerson*, 909 F.3d at 130 (The Government bears the burden to establish amounts for restitution and forfeiture). Indeed, the government failed to introduce any evidence that *traced* the Medicaid proceeds through St. Gabriel's operating accounts to Kirk's bonus payments.

As explained above, *Character Counts* revenue accounted for a very small portion (19.587 percent) of St. Gabriel's overall revenue. The government failed to present any evidence or witnesses to support its proposition that *without* the *Character Counts* billing, Kirk would not have received any bonuses. Indeed, Kirk's original sentencing filings explained to the court that many of the bonuses were for non *Character Counts* related achievements, like St. Gabriel's completed renovations and redesign of the health center to include the new, onsite dental practice and the infusion of artwork into the rooms of the health center, Kirk securing a $200,000 donation to the health center from the LeBlanc Family Fund, and contractual incentives for new sites established during Kirk's tenure as CEO. Doc. # 207, p. 6.

To be fair, Kirk does not submit that his bonuses are exempt from the

11

forfeiture, but he submits that the Court should apply the same proportionality approach applied to his salary to his bonus payments. Thus, as explained in detail above, 19.587 percent of his bonus payments could reasonably be forfeited since that amount corresponds to the revenue received by St. Gabriel as a result of the offense conduct.

### 3.    Proposed Calculations

Kirk received $340,644.17, in salary and $81,500 in bonuses during the offense conduct, for a total compensation of $422,144.17. Applying a proper 19.587 percent to his total compensation results in a correct specific money forfeiture amount of **$82,686.19.**

RESPECTFULLY SUBMITTED,

REBECCA L. HUDSMITH
Federal Public Defender

BY:    *s/ Dustin C. Talbot*
        DUSTIN C. TALBOT
        Appellate Chief
        Federal Public Defender's Office
        Middle and Western Districts of Louisiana
        102 Versailles Boulevard, Suite 816
        Lafayette, Louisiana 70501
        Telephone: (337) 262-6336

*Attorney for Defendant*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 27, 2024, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of the filing will be sent by operation of the Court's electronic filing system to all counsel of record.

*s/ Dustin C. Talbot*